| DISTRICT COURT, WELD COUNTY, COLORADO<br>901 9th Avenue<br>Greeley, Colorado 80631 | DATE FILED: November 12, 2019 3:46 PM<br>FILING ID: 13C658E0A749F<br>CASE NUMBER: 2019CV30940 |
|---|---|
| REP PROCESSING, LLC,<br><br>Plaintiff,<br><br>v.<br><br>BIG CHIEF PLANT SERVICES, LLC; DANNY AND DONNA WRIGHT REVOCABLE TRUST.<br><br>Defendants. | ▲ COURT USE ONLY ▲ |
| *Attorneys for Plaintiff REP Processing, LLC:*<br>Ben M. Ochoa, #16993<br>Adam L. Massaro, #42812<br>Lewis Roca Rothgerber Christie LLP<br>1200 17th Street, Suite 3000<br>Denver, CO 80202<br>303.623.9000<br>bochoa@lrrc.com<br>amassaro@lrrc.com | Case No.:<br><br>Division: |
| **COMPLAINT** | |

Plaintiff REP Processing, LLC states and alleges the following for its Complaint against Defendant Big Chief Plant Services, LLC and the Danny and Donna Wright Revocable Trust.

## INTRODUCTION

Plaintiff and Defendant Big Chief entered into an agreement for Big Chief to provide contractor services for a natural gas plant Plaintiff owns in Weld County. The multi-million dollar agreement had clear not to exceed price provisions. Part way through the project, the parties even agreed to a true-up to account for the scope of the project not addressed in the original agreement. Plaintiff also paid more to accelerate the project. Plaintiff assumed that Big Chief – an industry specialist— appropriately bid and negotiated the price for the project and the true-up. Big Chief, however, has demanded millions more during the last segment of the project. Big Chief's claim for millions does not pass the common-sense test. For instance, Big Chief claims it should receive millions more even though it did not complete all the work Plaintiff bargained for. Indeed, Big Chief was so behind schedule that Plaintiff actually reduced Big Chief's scope of



EXHIBIT A

work. Big Chief still wants to be paid like it did all the work.

The timing of Big Chief's demands to squeeze millions out of Plaintiff was no mistake. As the project neared close, Big Chief demanded over $5.5 million. Big Chief knew that Plaintiff had third-party contracts that were time sensitive and would expose Plaintiff to millions of dollars in liquidated damages if the plant did not start timely. Big Chief tried to use this pressure to extract millions from Plaintiff. The amount Big Chief claims it is owed also varies wildly from day-to-day. There is no explanation for such extreme divergence other than poor accounting or bad-faith.

Enter Big Chief's secured creditor into the mix—the Danny and Donna Wright Revocable Trust. Consistent with Big Chief's inability to manage money, it has defaulted on its payment obligations to its secured creditor. The secured creditor has now injected itself into this dispute. It has applied pressure to Big Chief to force Big Chief to file a notice of intent to lien the property for the project and assert other exaggerated positions against Plaintiff in an effort to shakedown Plaintiff. The secured creditor sees Big Chief's failings as a way to try to exploit innocent parties such as Plaintiff.

Judicial intervention is necessary. This Court should declare that Plaintiff does not owe a dime to either Big Chief or its creditor. The only money should go to Plaintiff for its overpayments after Big Chief under delivered. The Court should also order a full and exhaustive accounting because Big Chief's accounting is in disarray.

**PARTIES**

1. Plaintiff REP Processing, LLC is a Delaware limited liability company registered to do business in Colorado.

2. Plaintiff's principal place of business is 1675 Broadway, Denver, Colorado 80202.

3. Defendant Big Chief Plant Services, LLC ("Big Chief") is an Oklahoma limited liability company registered to do business in Colorado.

4. Defendant's principal place of business is 3520 Big Elk Drive, Elk City, Oklahoma 73644.

5. Defendant Danny and Donna Wright Revocable Trust ("Wright Trust") is an Oklahoma express trust.

6. The Wright Trust is a secured creditor of Defendant Big Chief.

## VENUE AND JURISDICTION

7. Plaintiff and Defendant Big Chief entered into an agreement regarding construction of the Project.

8. The work performed related to the Project occurred in Weld County.

9. Defendant Big Chief mobilized crews to the Project location and transacted business in Weld County and Colorado for months.

10. The parties' agreement also provides that this dispute shall be construed in accordance with the laws of the state of Colorado.

11. The Wright Trust, as Big Chief's secured creditor, has also injected itself into the dispute between Plaintiff and Big Chief.

12. The Wright Trust has taken actions with respect to payment obligations for the Project and pressured Defendant Big Chief to serve a notice of intent to lien the Project, with a lien to be recorded in Weld County for the Project.

13. The Wright Trust has also taken steps consistent with serving as Big Chief's agent, with Big Chief's authorization that the Wright Trust act on its behalf.

14. The Wright Trust is well aware that any dispute over payment obligations between Plaintiff and Big Chief will occur in Colorado, and the Wright Trust has directed its activities and efforts to the State of Colorado and Weld County.

15. Venue is proper under C.R.C.P. Rule 98.

16. Jurisdiction is proper in this Court under Colorado Constitution, Art. VI, Sec. 9.

## FACTUAL BACKGROUND

17. Plaintiff, and its affiliates, develop, acquire, and operate midstream assets in various basins thought Colorado, Wyoming, New Mexico, Texas, and Oklahoma.

18. Plaintiff connects energy basins to energy markets.

19. Plaintiff elected a location nearby Pierce, Colorado for the location of its Pierce Plant.

20. The Pierce Plant was designed to process natural gas extracted from nearby wells.

21. Kahuna Ventures LLC ("Kahuna") was engaged to oversee and supervise the Project and perform engineering and professional services for the Project.

22. Kahuna submitted the Project for a bidding process to contractors.

23. The Project was summarized in the bid documents as follows:

> The Pierce Gas Plant project is located in Pierce, CO. It will be owned and operated by RimRock Energy Partners. This project is for the construction and installation of the Piece Gas Plant and is for the full labor scope including civil structural, mechanical, and electrical. This labor specification will provide details about each scope of work and drawings to be used for bidding purposes. The major equipment to be installed under this work scope includes:
>
> - Inlet Slug Catcher and six (6) 36" fingers
> - 10,000 BPD Condensate Stabilizer Package including 30,000 gallon surge vessel and associated hot oil heating system
> - (2) Electric Drive Overhead Compressors
> - 600 gpm Amine Gas Treating Plant and associated hot oil heating system (FUTURE)
> - 200 MMSCFD MCSI Cryo Plant with two (2) electric drive refrigeration compressors and hot oil heating system
> - Two (2) electric drive Residue Compressor packages
> - Plant Flare and Flare Knockout vessel
> - Instrument Air compressor skid
> - Six (6) Condensate Storage Tanks and Truck Loading Combustor
> - Miscellaneous filters and vessels as described in the attached labor specification
> - 4160V MCC
> - 480V MCC
> - 25kV Transformers
> - 25kV Switchgear
>
> Mobilization is anticipated to start in early-January 2019 with a mechanical completion date of May 16th, 2019.

24. The bid materials also specified that the "bids shall include the following information . . . All bid numbers shall be Time and Material (T&M) Not to Exceed for the scope of the work included in this specification and all appendices and attachments."

25. The bid materials further specified that bidder "shall provide proposed payment schedules for civil/structural, mechanical, and electrical based on the provided scope of work based on their T&M Not to Exceed bid. A CONTRACTOR can bid all phases of this labor spec or just one individual portion."

26. The "T&M not to exceed" language was mentioned multiple times in the bid documents.

27. The bid documents further stated that the bidder "will also be required to adhere to the Master Service Agreement (MSA) attached to the bid document."

28. Bids were required to be submitted by December 12, 2018.

29. Big Chief submitted a bid for the Project.

30. Big Chief submitted a bid for the Project knowing that the timeline to complete the Project was quick. For instance, the bid documents identified "Project Completion" was "May 15, 2019 (mechanically complete)."

31. Big Chief's "T&M not to exceed" bid was for $10,813,474. This bid was for foundations, structural, mechanical, and insulation for the Project.

32. Big Chief was the lowest bidder as the contractor for the Project.

33. Plaintiff accepted Big Chief's "T&M not to exceed" bid for $10,813,474.

34. Big Chief has repeatedly acknowledged that its work for the Project was under a "T&M not to exceed basis."

35. Plaintiff and Big Chief also entered into a Master Service Agreement ("MSA") for the Project.

36. The MSA also includes a "Payment Procedure." "Contractor shall keep and maintain daily time sheets and invoices relating to all Work performed . . . All daily time sheets for labor, and invoices for material and equipment must be approved daily by a Company representative." Defendant Big Chief was also required to "submit a monthly statement and supporting documentation . . . establishing all that the percentage of the work represented on the Application for Payment have been completed in compliance with this Agreement."

37. The Payment Procedure included Plaintiff's right to review Defendant Big Chief's payment applications and approve or disapprove items.

38. The MSA also provides audit rights to Plaintiff: "Company shall have the right to audit Contractor's books and records relating to all invoices issued and all expenses incurred pursuant to this Agreement."

39. In January 2019, Big Chief mobilized and began performing work on the Project.

40. The Project progressed for several months. During this process, the parties discussed both accelerating the Project timeline and conducting a true-up.

41. The parties negotiated an accelerated Project timeline whereby the price increased by approximately $2 million more.

42. The true-up component was intended to address additional scope of the Project that had not been accounted for in the original bidding process. The new true-up price would then include the full price for the Project.

43. The true-up negotiations occurred in May 2019.

44. By May 2019, the parties negotiated to increase the Project price to approximately $18,000,000.

45. Big Chief was well aware that Plaintiff paid additional amounts for this accelerated timeline and expected that the costs for this accelerated timeline to be accounted for in the updated Project price.

46. Plaintiff also assumed that Big Chief understood the Project well enough after spending months on the job to accurately determine the new Project price by Spring 2019.

47. By the parties negotiating the true-up and accelerated timeline costs in the middle of the Project, Plaintiff did not expect there to be any pricing surprises as the Project moved toward completion.

48. Still, on July 24, 2019, Big Chief submitted a change order for $5,543,191.66. The change order was for over half the original "T&M not to exceed" bid of $10,813,474.

49. The July 24, 2019 change order was also change order number 16. Big Chief had already submitted 15 other change orders totaling over $1.5 million.

50. Change order 16 for approximately $5.5 million was also a surprise to Plaintiff because Big Chief had already negotiated several months earlier the true-up price for the Project.

51. There is no legitimate explanation for how Big Chief could have required such a high change order so late in the Project. At best, such an extreme divergence is poor management and planning by Big Chief. At worst, Big Chief saw an opportunity to exploit more money out of Plaintiff before the close of the Project.

52. Plaintiff has objected to change order 16 for $5,543,191.66, along with other improper change orders Big Chief has submitted.

53. As the disputes intensified between the parties, Big Chief threatened to walk from the Project and bring its subcontractors with them.

54. Failing to complete the Project in a timely fashion presented significant liability to Plaintiff.

55. Plaintiff—and its affiliates—had multiple contracts with third parties that were conditioned on the Project timely completing.

56. If the Project did not timely complete, Plaintiff was subjected to liquidated damages clauses in its third-party contracts, exposing Plaintiff to potentially millions of dollars in exposure.

57. Big Chief knew—or should have known—that failure to timely complete the Project exposed Plaintiff to millions of dollars in liability. It appears Big Chief however saw the potential liability Plaintiff faced as a way to squeeze more money out of Plaintiff.

58. As the situation intensified through late summer, Big Chief expressed multiple times that it lacked the funds and resources to pay its subcontractors so that the Project could be finished in a timely fashion.

59. Plaintiff was compelled to pay directly subcontractors for the Project to ensure that the Project completed timely.

60. Plaintiff is permitted to take such actions under the MSA with Big Chief.

61. Big Chief was aware that Plaintiff was taking these steps to pay subcontractors directly.

62. Big Chief was also aware that Plaintiff paid the subcontractors under protest and with the right to seek contribution from Big Chief and object to pending change orders by Big Chief.

63. Plaintiff was forced to pay over $2.4 million to subcontractors who Big Chief failed to pay timely.

64. The $2.4 million does not even account for all the amounts due and owing to subcontractors for the Project. There are still hundreds of thousands that subcontractors claim are owed.

65. In total, Plaintiff has expended over $24 million on the Project (over $22.3 million to Big Chief and over $2.4 million to subcontractors).

66. Big Chief has grossly exceeded the parties' agreement, causing millions of dollars of harm to Plaintiff.

67. Indeed, not only has Big Chief caused significant increases in the price well beyond any not to exceed price but also Big Chief did not even complete all the scope of work that Plaintiff bargained for. Consequently, Plaintiff has expended over a million to have others complete the work that Big Chief failed to perform.

68. Remarkably, Big Chief still demands millions more from Plaintiff.

69. Big Chief claims that its invoices justify another $14,777,135, while after applying "credits," the amount owed is apparently $11,652,217.70.

70. But Plaintiff has already spent close to $30 million on the Project addressing the harm Big Chief has caused. Now Big Chief wants millions more beyond the $30 million Plaintiff

has already expended. Such an outcome drastically exceeds the initial bid cost and even the true-up and costs for an accelerated finish.

71. Plaintiff has demanded multiple times to Big Chief that Big Chief provide an accounting to establish its hopelessly inflated numbers.

72. Big Chief's accounting is in disarray. Big Chief has not been able to establish with any degree of certainty the amounts it claims it is owed. Indeed, from day-to-day the amount Big Chief claims it owes fluctuates by millions.

73. Plaintiff's preliminary investigation has also identified accounting anomalies that call into question Big Chief's accounting throughout the entire Project.

74. Big Chief also demands millions even though it admits it "made mistakes and we own them . . . ."

75. Big Chief's claim for millions does not pass the common-sense test either. For instance, Big Chief claims it should receive millions more even though it did not complete all the work Plaintiff bargained for. Big Chief was so behind schedule that Plaintiff reduced Big Chief's scope of work (including removing plant flare and tank battery work as well as portion of the restoration and punch list item work). But Big Chief still wants to be paid like it completed all the work it agreed to perform for Plaintiff. The law does not work that way.

76. Big Chief was also required to fabricate and install a portion of the amine hot oil line for the Project but did not complete this segment of the Project either, requiring Plaintiff to pay for someone else to finish the work. But in Big Chief's mind Plaintiff must also pay Plaintiff for this scope of work even though Big Chief did not complete it. This makes no sense.

77. There are other examples of positions Big Chief has taken that defy logic. Big Chief billed in multiple instances like Big Chief was working extended days and long hours to complete the Project on time. But at the same time, Big Chief struggled throughout the Project to maximize its output and timely complete portions of the Project.

78. Further, Big Chief was responsible for managing the execution of its scope of work within the T&M not to exceed amount. This gave Big Chief control over manpower, hours worked, and he like. The bid document specifically references that Big Chief "coordinate" construction activities with the construction manager (Kahuna). Big Chief also had a full-time project manager on site to oversee their work and manage day to day activities. Cost overruns on the Project were not Plaintiff's fault but rather a result of Big Chief severely mismanaging its manpower on site.

79. Unfortunately, Big Chief refuses to take responsibility for the harm it has caused Plaintiff.

**The Wright Trust Interjects Itself Into the Dispute**

80. Big Chief also has a secured creditor –the Wright Trust.

81. Plaintiff understands that the Wright Trust is the primary secured creditor of Big Chief.

82. Further, Plaintiff understands that Big Chief is in default and the Wright Trust will foreclose upon Big Chief and assert its rights as a secured creditor. Consequently, the Wright Trust stands in the shoes of Big Chief as its creditor.

83. The Wright Trust has interjected itself into the dispute between Plaintiff and Big Chief on multiple occasions.

84. The Wright Trust has hired its own counsel—Crowe & Dunlevy. The Wright Trust's counsel is working hand-in-hand with Big Chief to try to extract more money from Plaintiff.

85. For instance, the Wright Trust has sent multiple collection emails on behalf of Big Chief to Plaintiff and Plaintiff's counsel.

86. In one of these letters, counsel for the Wright Trust sent the security agreement and other documents to Plaintiff while demanding that Plaintiff "remit all proceeds due and owing [to] BCPS . . . to the Trust in care of this firm." The letter closed with the representation that the "instructions set forth in this letter regarding payment of the Invoices directly to the Trust have been **ratified** and **affirmed** by Chad Marcum, the Manager of BCPS [Big Chief]." (emphasis added).

87. This only affirms the Wright Trust and Big Chief are working in concert against Plaintiff.

88. Counsel for the Wright Trust has spent hours strategizing with Big Chief over how to collect money from Plaintiff.

89. The Wright Trust has applied pressure to Big Chief to force Big Chief to serve a notice of intent to lien the property for the Project and assert other exaggerated positions against Plaintiff in an effort to shakedown Plaintiff.

90. The Wright Trust has done so in an effort to force Plaintiff to pay—either directly or indirectly—large sums to the Wright Trust.

91. The Wright Trust sees Big Chief's failings as an opportunity to extract money from Plaintiff to payoff Big Chief's debts.

92. The Wright Trust is interested in maximizing its recovery on the Big Chief debt regardless of whether Plaintiff actually has any outstanding payment obligations to Big Chief.

93. In sum, the Wright Trust sees Big Chief's failings as a way to try to shakedown innocent parties such as Plaintiff.

94. No conditions precedent exist for Plaintiff to file suit.

**Claim for Relief**
**(Declaratory Judgment – All Parties)**

95. Plaintiff incorporates by reference the previous allegations as set forth herein.

96. A live and justiciable case and controversy exists between the parties.

97. A declaration is necessary to adjudicate the parties' rights.

98. The Wright Trust also has a direct financial interest in the dispute and the outcome of it will impact it financially.

99. Plaintiff and Big Chief entered into an agreement.

100. Plaintiff asserts that it has no obligation to perform further because of Big Chief's breaches.

101. Big Chief insists that Plaintiff still perform and pay it millions.

102. Plaintiff is entitled to declaratory relief that Big Chief has committed material breaches of the parties' agreement, and Plaintiff has no duty to perform and no obligation to pay either Big Chief or the Wright Trust any amounts of money.

**Claim for Relief**
**(Breach of Contract – Big Chief)**

103. Plaintiff incorporates by reference the previous allegations as set forth herein.

104. Plaintiff entered into an agreement with Big Chief.

105. Plaintiff performed under the agreement, including paying Big Chief millions.

106. Big Chief has also failed to provide its contractually obligated accounting that Plaintiff has requested multiple times.

107. Big Chief has failed to perform under the parties' agreement, including failing to stay within the T&M not to exceed and grossly exceeding it.

108. Big Chief's breaches are material.

109. Big Chief's breaches have resulted in Plaintiff paying millions more for the Project than it should have.

110. Plaintiff has been damaged by Big Chief's breaches.

**Claim for Relief**
**(Equitable Accounting – Big Chief)**

111. Plaintiff incorporates by reference the previous allegations as set forth herein.

112. Plaintiff has demanded Big Chief provide an accounting in response to the millions of dollars that Big Chief has demanded.

113. Big Chief's failure to provide an accounting also raises serious questions about the quality and accuracy of Big Chief's accounting throughout the Project.

114. Plaintiff has legitimate concerns that Big Chief's accountings have resulted in numerous errors that in turn have resulted in Big Chief being overpaid.

115. Plaintiff requires a proper accounting to determine fully how much Plaintiff has overpaid Big Chief.

116. The Court should order that Big Chief provide an equitable accounting.

**Claim for Relief**
**(Unjust Enrichment – Big Chief)**

117. Plaintiff incorporates by reference the previous allegations as set forth herein.

118. Plaintiff enriched Big Chief, including paying it millions and making millions of dollars of payments to subcontractors of Big Chief because Big Chief could not afford to pay.

119. Big Chief did not provide services commensurate with the monetary and non-monetary benefits it received.

120. It is unjust for Big Chief to keep the benefits afforded to it by Plaintiff.

121. Big Chief must disgorge and return all benefits and monies unjustly received.

WHEREFORE, Plaintiff requests an entry of judgment in its favor and against each defendant, entry of an award of monetary damages for Plaintiff and against each defendant, on each claim for relief, and award of pre- and post-judgment interest, and costs and attorneys' fees.

Respectfully submitted November 12, 2019.

LEWIS ROCA ROTHGERBER CHRISTIE LLP

*s/ Adam L. Massaro*
Ben M. Ochoa
Adam L. Massaro

*Attorneys for Plaintiff REP Processing, LLC*

Plaintiff's address:
1675 Broadway, Suite 2075
Denver, CO 80202